

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MURRAY DEVINE & CO., INC.,** | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| **STOUT RISIUS ROSS, INC.,** | : No.: __16__  __5317__ |
| **WILLIAM B. HAFER, MATTHEW MISISCO,** | : |
| **THOMAS J. KENNY, COLIN GRAY, and** | : |
| **JAMES SPAMAN,** | : |
| | : |
| Defendants. | : |

### COMPLAINT

Plaintiff, Murray Devine & Co., Inc., brings this civil action against Defendants, Stout Risius Ross, Inc., William B. Hafer, Matthew Misisco, Thomas J. Kenny, Colin Gray, and James Spaman, and in support thereof avers as follows:

### NATURE OF THE CASE

1.      This is an action for breach of contract, tortious interference with current and prospective contractual relations, violation of the federal and Pennsylvania trade secrets statutes, aiding and abetting, and injunctive relief.

2.      Plaintiff's claims arise from the Defendants' collective and concerted action in stealing Plaintiff's employees, clients and trade secrets.

3.      As discussed below, the individual Defendants collectively left the employ of Plaintiff to work for the corporate Defendant (who is a competitor of Plaintiff) in violation of certain restrictive covenants in certain employment agreements, and took with them certain trade secrets of Plaintiff in violation of federal and state statutory law and common law.

## PARTIES

4.      Plaintiff, Murray Devine & Co., Inc. ("MDC"), is a Pennsylvania corporation, with a principal place of business located at 1650 Arch Street, Philadelphia, PA 19103.

5.      Defendant Stout Risius Ross, Inc. ("SRR"), is a Michigan based corporation, with offices in Philadelphia and throughout the United States.

6.      Defendant, William B. Hafer ("Hafer") is a resident of New Jersey.

7.      Hafer was previously employed by MDC as Director for Sales and Business Development, and worked out of MDC's New York City office.  Hafer is now employed by SRR as a Managing Director and working out of SRR's New York City office.

8.      Defendant, Matthew Misisco ("Misisco") is a resident of New York.

9.      Misisco was previously employed by MDC as Vice President for Business Development – New York, and worked out of MDC's New York City office.  Misisco is now employed by SRR as a Managing Director and working out of SRR's New York City office.

10.     Defendant, Thomas J. Kenny ("Kenny") is a resident of New Jersey.

11.     Kenny was previously employed by MDC as a Senior Managing Director, and worked out of MDC's Philadelphia office.  Kenny is now employed by SRR as a Managing Director and working out of SRR's newly created Philadelphia office.

12.     Defendant, Colin Gray ("Gray") is a resident of Pennsylvania.

13.     Gray was previously employed by MDC as a Director, and worked out of MDC's Philadelphia office.  Gray is now employed by SRR as a Director and working out of SRR's newly created Philadelphia office.

14.     Defendant, James Spaman ("Spaman") is a resident of Pennsylvania.

2

15.     Spaman was previously employed by MDC as a Director, and worked out of MDC's Philadelphia office.  Spaman is now employed by SRR as a Managing Director and working out of SRR's newly created Philadelphia office.

JURISDICTION AND VENUE

16.     This Honorable Court has federal question jurisdiction to adjudicate this matter pursuant to 28 U.S.C. §1331.

17.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(a) as this is the judicial district in which a substantial part of the events giving rise to the claims occurred.

RELEVANT FACTS

MDC's Business

18.     MDC has been in business for 27 years.

19.     MDC provides an array of business valuation services, including financial opinions and advisory services to Business Development Companies (BDC's), private equity, corporate, venture capital, and commercial banking clients.

20.     MDC's services are frequently requested by clients involved in mergers and acquisitions, clients (such as BDC's) that require valuations for regulatory and financial reporting purposes, and clients involved in middle market lending.

21.     The geographic area of MDC's client base is nationwide.

22.     MDC identifies prospective clients through its contacts in the industry and from referral sources (i.e., attorneys and other professionals that provide services to the client base).

23.     MDC's referral contacts are a significant part of its business development strategy, and MDC maintains a significant budget for developing such contacts.

3

24.     When a prospective client is identified, the appropriate contact person(s) within that organization must be ascertained in order to effectively solicit business from the prospective client.

25.     Once the appropriate contact person is identified, MDC is in a position to effectively solicit that prospective client according to its needs.

26.     After MDC has been retained to provide services to a client, it is incumbent upon MDC to maintain contact with the client to strengthen the relationship and address the client's future needs.

27.     MDC identifies, services and interacts with its clients and prospective clients largely through its sales staff and its analysts.

28.     The sales employees, working in concert with the analysts, are primarily responsible for developing new clients, and for maintaining and strengthening relationships with existing clients.

29.     The analysts, working in concert with the sales employees, are primarily responsible for providing valuation services for, and maintaining strong relationships with, the firm's clients.

30.     Hafer and Misisco were primarily responsible for sales (i.e., client development and maintenance). Since they lacked the technical knowledge required to showcase the depth and breadth of the firm's valuation expertise, they relied heavily on analysts to assist them with their client development and maintenance activities.

### MDC's Trade Secrets

### MDC's Client Database

31.    To effectively identify and solicit prospective clients, and to maintain and strengthen existing client relationships, MDC maintains a confidential database of client information.

32.    This database (hereafter the "Client Database") contains *inter alia* the contact information for each client and prospective client (including the appropriate person(s) within the organization with decision making authority); the history of engagements and contracts with each client; the date of each contact with the client and a summary of what was discussed; the pricing for the services offered and/or provided to the client or prospective client; and notes specific to the referral sources and current and prospective clients.

33.    MDC's Client Database has been developed over the 27 years of its existence, and the information contained in this database is not publicly available.

34.    The Client Database is confidential, and access to the Client Database is password protected.

35.    The Client Database is a trade secret of MDC.

### MDC's Financial Models

36.    Many of the services provided by a valuation company like MDC require data to be imported into financial models designed for each specific area of valuation.

37.    These financial models are uniquely crafted based on the analytical theories, formulas and assumptions selected and made by the designer.

38.    Most, if not all, valuation firms design and develop their own specific financial models, which are unique to their organization.

5

39.     No two financial models are alike, and if the same data is inputted into two financial models designed for the same evaluation purpose, the results will typically not be the same.

40.     But for the illegality in doing so, any valuation company would welcome the opportunity to come into possession of a competitor's financial models.

41.     MDC has developed numerous financial models crafted from its own research, evaluation experience, and project development (the "MDC Financial Models").

42.     The MDC Financial Models are utilized in performing the sophisticated valuation services that MDC provides to a variety of clients, and such services could not be provided without access to the MDC Financial Models.

43.     The MDC Financial Models are not publicly available, are confidential, and are password protected.

44.     The MDC Financial Models are trade secrets of MDC.

SRR's Business

45.     SRR is a business consulting company with practice areas in multiple facets of the financial services industry.

46.     One of SRR's practice areas is the provision of many of the same types of valuation services that MDC provides.

47.     SRR markets its services in the same geographic area that MDC markets.

48.     SRR is in direct competition with MDC.

49.     At all times relevant, SRR had a New York City office.

50.     Prior to hiring MDC's former employees, SRR was not a significant player in the portfolio valuation business, nor did SRR have an office in Philadelphia.

6

<u>MDC's Former Employees</u>

51.     Hafer was hired by MDC in March 2008 as the Director for Sales and Business Development.

52.     Hafer was responsible for selling MDC's valuation services to new and existing clients, primarily in the Northeast region of the country.

53.     Hafer worked out of MDC's New York City office, and the majority of clients he was in contact with while employed by MDC are located in the New York metropolitan area.

54.     Hafer is currently employed by SRR, and is working out of SRR's New York City office.

55.     Misisco was hired by MDC in July 2009 as a Vice President for Business Development - New York.

56.     Misisco was responsible for selling MDC's valuation services to new and existing clients primarily in the New York metropolitan area.

57.     Misisco worked out of MDC's New York City office, and the clients he was in contact with while employed by MDC are located primarily in the New York metropolitan area.

58.     Misisco is currently employed by SRR, and is working out of SRR's New York City office.

59.     During the relevant time period, Kenny, Gray and Spaman were each employed by MDC as analysts.

60.     Kenny, Gray and Spaman are all currently employed by SRR, and are working out of SRR's newly created Philadelphia office.

61.     Kenny, Gray and Spaman are collectively hereafter referred to as the "Analysts".

7

62.     Prior to their departure from MDC, Hafer and Misisco worked closely with the

Analysts in soliciting prospective clients, and servicing and maintaining existing client

relationships.

63.     Hafer, Misisco, Kenny, Gray and Spaman are collectively hereafter referred to as

the "Former MDC Employees".

Hafer's and Misisco's Restrictive Covenants

64.     When he joined MDC in March 2008, Hafer signed an employment agreement

which contains the following restrictive covenants:

     a)     Confidential Information:

You agree to keep confidential and shall not, except with, prior written consent of
the Company, directly or indirectly, voluntarily or involuntarily, communicate,
disclose or divulge to any person, or for the benefit of any person other than the
Company, any and all knowledge or information concerning the conduct and
details of the Company's business, including, without limitation, trade secrets,
customer lists, technology, know-how, methods, contracts, costs, policies, sales
methods, financial condition, operations, statistics and suppliers; provided,
however, that this clause shall not apply to (a) any information otherwise
available from public sources, (b) any information already known to the recipient,
unless such knowledge emanated from a breach of this clause or the breach of any
other confidentiality obligation owing to the Company by any other party, or (c)
to the extent disclosure is required by law.

     b)     Non-Compete:

You agree that you will not, during the period you are employed by the Company
(pursuant to this Agreement or otherwise) and for a period of one year after the
effective date of any termination of your employment with the Company (whether
voluntary or involuntary), engage, directly or indirectly (except through the
Company), either as principal, officer, director, agent, proprietor, shareholder,
owner, partner, member, consultant, manager or employee, or participate in the
ownership, management, operation or control of any entity that is in the same or
substantially similar business as, or competes with, the Company or any of its
affiliates.

8

c) <u>Non-Solicitation</u>:

You agree that you will not, during the period you are employed by the company (pursuant to this Agreement or otherwise) and for a period of one year after the effective date of any termination of your employment with the Company (whether voluntary or involuntary), directly or indirectly, hire, solicit, encourage, entice or induce for employment any employee of the Company or its affiliates or take action which results in the termination of employment or other arrangements between the Company and/or its affiliates and such employee or otherwise interfere with such employment. You further acknowledge and agree that the Company will invest substantial time and effort in developing relationships with clients, referral sources and subcontractors. Accordingly, you agree that for as long as you are an employee of the Company (pursuant to this Agreement or otherwise) and for a period of one year after the effective date of any termination of your employment with the Company (whether voluntary or involuntary), you shall not, directly or indirectly, solicit, encourage, entice or induce any of the Company's or its affiliates' clients, referral sources or subcontractors to cease doing business with the Company or its affiliates or otherwise to reduce, terminate or restrict or alter such client's, referral source's or subcontractor's relationships with the Company or its affiliates in any manner that is adverse to the Company or its affiliates.

d) <u>Company Property</u>

You further agree that all business of the Company developed by you including, without limitation, all contracts, revenues, income, fees, commissions, compensation, records, customer and other lists, agreements, memoranda, notes, records and other documents (and all copies thereof) made or compiled by you or made available to you concerning the business of the Company or the Company itself, are and shall continue to be the exclusive property of the Company for its sole use and shall be delivered to the Company promptly upon termination of your employment, or at any other time upon request by the Company. You further grant to the Company, without any separate remuneration or compensation, your entire right, title and interest in and to all research, information, customer and other lists and all other investment, advisory, technical and research data made, conceived, developed and/or acquired by you solely or jointly with others during the period of employment by the Company, which relate to the business of the Company as it may, from time to time hereafter be rendered or propose to be rendered.

61. A copy of Hafer's employment agreement is attached as Exhibit "A".

62.     When he joined MDC in July 2009, Misisco signed an employment agreement which contains the same restrictive covenants as Hafer's employment agreement. A copy of the Misisco's employment agreement is attached as Exhibit "B".

### The Conspiracy to Steal
### MDC's Clients and Employees

63.     In March of 2016, the principals of MDC told Hafer, Misisco and Kenny, on a strictly confidential basis, that they had been approached by a company interested in purchasing MDC, and that they were in discussions regarding that potential transaction.

64.     Shortly thereafter, Hafer, Misisco and Kenny leaked this confidential information to Gray and Spaman.

65.     Thereafter, the Former MDC Employees collectively decided to seek employment with SRR (a competitor of MDC), by selling themselves as "package deal". Together, they could work to grow SRR's portfolio valuation business by poaching MDC's clients and recruiting other MDC employees to defect to SRR.

66.     The Former MDC Employees also collectively decided that they would benefit from taking MDC's confidential information.

67.     In furtherance of their scheme, in March and April of 2016, two or more of the Former MDC Employees accessed MDC's computer systems and stole confidential information, including, but not limited to information contained in the Client Database and the MDC Financial Models, by downloading such information to a mobile storage device and/or emailing such information to a non-MDC email account.

68.     Also in furtherance of their scheme and unbeknownst to MDC, in April 2016 (while still employed by MDC) Hafer referred two prospective clients to SRR.

10

69.     Hafer was scheduled to meet with MDC's prospective purchaser on the evening of April 20, 2016.  The Defendants, therefore, collectively decided that Hafer and the three Analysts would all resign on April 20, 2016, before Hafer's meeting took place.

70.     Misisco, for reasons unknown to Plaintiff, was scheduled to resign several months later.

71.     In furtherance of their scheme, on the morning of April 20th, the Analysts collectively informed MDC's President that they were resigning, effective immediately.

72.     In addition, before leaving MDC's offices that day, the Analysts revealed confidential information of MDC by telling other employees that MDC was being sold.

73.     In furtherance of their scheme and unbeknownst to MDC, Kenny took a file with him when he left MDC which contained voluminous, confidential client contact information, much of which was not contained on the Client Database.

74.     In furtherance of their scheme, on the afternoon of April 20, 2016, at 5:17 p.m., Hafer also resigned his employment with MDC, by email.

75.     Hafer's email resignation was sent approximately 15 minutes before his scheduled meeting with MDC's prospective purchaser.

76.     At the time that Hafer and the Analysts resigned, they did not disclose that they were all going to work for SRR (MDC's competitor), that SRR was going to open a Philadelphia office specifically for them, that they collectively would solicit MDC's clients and employees for SRR's benefit, or that Misisco would be joining them at SRR in the near future.

77.     At the time that Hafer and the Analysts resigned, Misisco did not disclose that he knew that they were all going to work for SRR, that SRR was going to open a Philadelphia office

specifically for them, that they collectively would solicit MDC's clients and employees for

SRR's benefit, or that he would be joining Hafer and the Analysts at SRR in the near future.

78.     Prior to and immediately following the April resignations, the Former MDC

Employees began soliciting MDC's clients on behalf of SRR.

79.     On July 15, 2016, Misisco resigned from MDC by email effective immediately,

without mentioning that he was going to work for SRR - - a direct competitor of MDC - - in

violation of the restrictive covenants in his employment agreement.

80.     SRR and the Former MDC Employees also recruited Mathew O'Neill, another

analyst at MDC, to join SRR.  O'Neill had significant experience in running the MDC Financial

Models.

81.     On July 15, 2016, the same day Misisco resigned, O'Neill left MDC to join SRR

in its newly created Philadelphia office.

SRR Knowingly and Intentionally Aided and Abetted
the Violation of the Restrictive Covenants in
Hafer's and Misisco's Employment Agreements

82.     SRR was aware of the restrictive covenants in Hafer's and Misisco's employment

agreements when it hired them and the Analysts.

83.     SRR was aware of the restrictive covenants in Hafer's and Misisco's employment

agreements when it conspired with them and the Analysts to steal MDC's clients, prospective

clients, referral sources, employees and confidential information.

84.     Once MDC learned that Hafer and the Analysts had all gone to work for SRR,

MDC notified these Defendants about the existence of the restrictive covenants and the other

legal restrictions regarding their use of MDC's confidential information.

12

85.     On April 25, 2016, MDC sent a letter to SRR informing it of the restrictive covenants in Hafer's employment agreement (of which SRR was already aware), and requested SRR to identify the steps it was taking to ensure Hafer's compliance with those restrictive covenants. A copy of that letter is attached as Exhibit "C".

86.     MDC further requested SRR to identify Hafer's duties and the geographic area for which he was responsible.

87.     On April 25, 2016, MDC also wrote to Hafer regarding the restrictive covenants to which he was legally bound, and requested that he confirm the he was employed with SRR, and provide a job description and the geographic area for which he was responsible on behalf of SRR.

88.     On April 25, 2016, MDC also wrote to each of the Analysts, reminding them of their legal obligation to not disclose any of MDC's confidential information or otherwise misappropriate MDC's property.

89.     The Analysts, however, were already aware of their legal obligations because MDC's Employee Handbook put all of its employees on notice of the prohibition against revealing confidential information.

90.     Several days later, SRR responded to MDC's April 25th correspondence with a terse letter which simply confirmed that SRR had hired Hafer as a Managing Director, and stated that Hafer had agreed "not to bring anything from any former employer with him to SRR". A copy of SRR's April 28th letter is attached as Exhibit "D".

91.     SRR's April 28th letter made no mention of Hafer's duties or the geographic area for which he would be responsible.

13

92.     SRR's April 28th letter did not explain how SRR, a competitor of MDC, was going to ensure that Hafer not act in competition with MDC or otherwise engage in conduct which violated the restrictive covenants in his MDC employment agreement.

93.     SRR's April 28th letter also did not mention SRR's hiring of the Analysts or the opening of the Philadelphia office.

94.     On July 18, 2016, MDC sent a letter to Misisco regarding the restrictive covenants to which he was bound, and requested that he provide details about his new employer and provide a job description and the geographic area for which he was responsible.

95.     One month later, Misisco responded by email, stating that he was aware of his employment agreement with MDC, that he intended to abide by its post-employment restrictions, and that any further questions should be directed to SRR's legal counsel.

96.     On August 15, 2016, MDC also sent a letter to SRR advising SRR of the restrictive covenants in Misisco's contract, and requesting the same information about Misisco that was previously requested with respect to Hafer.  A copy of that letter is attached as Exhibit "E".

97.     On August 30, 2016, SRR responded that it was not going to stop Misisco from competing with MDC, because SRR did not believe that the restrictive covenant in his MDC employment agreement was enforceable.  A copy of that letter is attached as Exhibit "F".

98.     SRR knowingly and intentionally aided and abetted the violation of the restrictive covenants in the employment agreements.

99.     SRR's corporate philosophy is to grow by stealing the employees and confidential information of its competitors, regardless of the existence of legal restrictions prohibiting such conduct.

14

100.     In short, SRR's *modus operandi* is to ignore restrictive covenants and wait to be sued.

101.     This is exactly what SRR did when it hired a former employee of Capsicum Group, another competitor of SRR. *See Capsicum Group, LLC v. Rosenthal*, 2013 U.S. Dist. LEXIS 177293; 2013 WL 6667822 (E.D. Pa. 2013).

The Defendants Concerted Effort to Violate
the Restrictive Covenants and Use MDC's Confidential Information

102.     Since their defection to SRR, the Former MDC Employees and SRR have collectively acted to violate each of the restrictive covenants contained in the MDC employment agreements of Hafer and Misisco.

103.     Since their defection to SRR, SRR and the Former MDC Employees have collectively solicited MDC's clients and referral sources.

104.     Prior to their defection to SRR, the Former MDC Employees took with them MDC's confidential information, including the information in the Client Database and the MDC Financial Models.

105.     Since their defection to SRR, Hafer and Misisco have been working for SRR in the same capacity and geographic area in which they worked while at MDC.

106.     Since their defection to SRR, Hafer and Misisco have been performing the same duties that they had while employed at MDC.

107.     Since their defection to SRR, Hafer and Misisco have been soliciting MDC's referral sources, clients and prospective clients, and have used MDC's confidential information to assist them in that regard.

108.    Since their defection to SRR, Hafer and Misisco have solicited MDC employees to join SRR.

109.    Since their defection to SRR, the Analysts have assisted Hafer and Misisco in soliciting MDC's referral sources, clients and employees, and have used MDC's confidential information to assist them in that regard.

110.    Since their defection to SRR, the Former MDC Employees have falsely represented to MDC's clients and prospective clients that MDC was in the process of closing its business.

111.    On September 7, 2016, in violation of his employment agreement, Hafer attended one of the premier BDC conferences.  This conference was organized by one of MDC's long time referral sources, and was attended by many clients, prospective clients and other referral sources of MDC.

112.    Both Spaman and Gray joined Hafer at this conference, and together they solicited MDC's clients, referral sources and prospective clients.

113.    In addition, Hafer attended another conference recently held by the Association of Corporate Growth, which was also attended by clients, prospective clients and referral sources of MDC.

114.    To date, the Defendants have continued to solicit MDC's referral sources and current and prospective clients, and utilize MDC's confidential information in furtherance of that effort.

115.    To date, Hafer and Misisco continue to violate the restrictive covenants in their MDC employment agreements by working for SRR, soliciting MDC's referral sources and

current and prospective customers, utilizing MDC's confidential information, and soliciting MDC's employees to leave and join SRR.

116.    To date, the Analysts and SRR have worked in conjunction with Hafer and Misisco in soliciting MDC's referral sources and current and prospective customers, utilizing MDC's confidential information, and soliciting MDC's employees to leave and join SRR.

117.    To date, the Defendants continue to interfere with MDC's current and prospective contractual relationships by making false representations about MDC to competitors, referral sources and current and prospective clients regarding MDC's intent to close its business operations.

118.    As a direct and proximate result of the Defendants' unlawful conduct, MDC has suffered and will continue to suffer significant damages, including lost business opportunities, reputational harm and interruption with its business operations.

## COUNT I
## Breach of Contract
### (against Hafer and Misisco)

119.    Plaintiff incorporates by reference herein the preceding paragraphs as if fully set forth at length.

120.    Hafer and Misisco each entered into a contractual relationship with MDC for employment (the "Employment Contracts").

121.    Pursuant to the Employment Contracts, Hafer and Misisco are required to keep as confidential their knowledge and all information in their possession concerning the conduct and details of MDC's business, including, without limitation, trade secrets, customer lists, technology, know-how, methods, contracts, costs, policies, sales methods, financial condition, operations, statistics and suppliers (the "Confidentiality Restriction").

17

122.     Pursuant to the Employment Contracts, Hafer and Misisco are prohibited *inter alia* from working with a competitor of MDC within one year of their termination of employment with MDC (the "Non-Compete Restriction").

123.     Pursuant to the Employment Contracts, Hafer and Misisco are prohibited *inter alia* from soliciting MDC's referral sources, clients or employees to join SRR within one year of their termination of employment with MDC (the "Non-Solicitation Restriction").

124.     Upon leaving MDC and joining SRR, Hafer and Misisco violated the Confidentiality, Non-Compete and Non-Solicitation Restrictions by working for SRR in direct competition with MDC from the same geographic area in which they had worked for MDC; soliciting MDC's referral sources, clients, prospective clients and employees; and by using MDC's confidential information in furtherance of their efforts to recruit MDC's referral sources, clients and employees on behalf of SRR.

125.     Hafer's and Misisco's unlawful conduct breached their Employment Contracts.

126.     Hafer's and Misisco's unlawful conduct also breached their implied contractual duties of good faith and fair dealing.

127.     As a direct and proximate result of Hafer's and Misisco's multiple breaches of their Employment Contracts, MDC has suffered and will continue to suffer damages in excess of $500,000.

COUNT II
Conspiracy and Aiding and Abetting the Breaches of the Employment Contracts
(Against SRR, Kenny, Gray, and Spaman)

128.     MDC incorporates by reference herein the preceding paragraphs as if fully set forth at length.

129.     SRR, Kenny, Gray and Spaman, at all times relevant, were aware of the restrictive

18

covenants in the Employment Contracts.

130.   SRR, Kenny, Gray and Spaman, at all times relevant, were aware that Hafer and Misisco were contractually prohibited from working for SRR, soliciting the Analysts and other MDC employees to work for SRR, and soliciting MDC's referral sources and clients to transfer their relationships and business to SRR.

131.   SRR, Kenny, Gray and Spaman, at all times relevant, were aware that Hafer, Misisco and the Analysts had a legal obligation to not use MDC's confidential information or otherwise reveal that information to SRR.

132.   SRR, Kenny, Gray and Spaman collectively conspired and acted, in conjunction with Hafer and Misisco to compete with MDC; solicit MDC's referral sources, clients and prospective clients; spread false and damaging information regarding MDC; and utilize MDC's confidential information in furtherance of those efforts.

133.   SRR, Kenny, Gray and Spaman collectively, conspired and acted to assist Hafer and Misisco in carrying out their duties on behalf of SRR, and in direct competition with MDC, by providing SRR, Hafer and Misisco with the support they needed to steal MDC clients and prospective clients, and otherwise compete against MDC.

134.   In doing so, SRR, Kenny, Gray and Spaman collectively aided and abetted Hafer and Misisco in breaching their Employment Agreements.

135.   As a direct and proximate result of these Defendants' activities in aiding and abetting the multiple breaches of the Employment Contracts, MDC has suffered and will continue to suffer damages in excess of $500,000.

19

COUNT III
Tortious Interference with Current and Prospective Contractual Relations
(Against all Defendants)

136.    MDC incorporates by reference herein the preceding paragraphs as if fully set forth.

137.    At all times relevant, the Defendants knew or should have known that Hafer and Misisco were required to comply with the restrictive covenants in their Employment Contracts, and that the Analysts were required to comply with the laws pertaining to confidential information.

138.    At all times relevant, the Defendants knew or should have known that Hafer and Misisco were not permitted to work for SRR, or to solicit referral sources, clients or employees of MDC.

139.    At all times relevant, the Defendants knew or should have known that Hafer, Misisco and the Analysts were not permitted to use or disseminate confidential information of MDC.

140.    At all times relevant, the Defendants knew or should have known that MDC was not going out of business, and that any representations to that effect were false.

141.    At all times relevant, the Defendants knew or should have known that it was unlawful for SRR to hire the Former MDC Employees, staff a Philadelphia office with the Former MDC Employees, and have the Former MDC Employees solicit MDC's referral sources, clients and employees and otherwise act in concert to compete with MDC.

142.    SRR and the Analysts interfered with MDC's existing contractual relationships with Hafer and Misisco by hiring them and supporting their activities in violation of the restrictive covenants in their Employment Agreements.

20

143.    All of the Defendants interfered with MDC's existing and prospective contractual relationships with referral sources, clients and prospective clients, by acting in concert to solicit such referral sources, clients, prospective clients and employees, and by acting in concert in spreading false information regarding MDC to such individuals.

144.    The Defendants were not justified or privileged to interfere with MDC's existing and prospective contractual relations in the manner in which they did.

145.    The Defendants' interference with MDC's existing and prospective contractual relationships was tortious as a matter of law.

146.    As a direct and proximate result of the Defendants' tortious interference with MDC's existing and prospective contractual relationships, MDC has incurred damages in excess of $500,000.

147.    The Defendants' tortious conduct was sufficiently wanton, willful and reckless as to give rise to an award of punitive damages.

### COUNT IV
### Injunctive Relief
### (Against all Defendants)

148.    MDC incorporates by reference herein the preceding paragraphs as if fully set forth.

149.    The Defendants have collectively and concertedly engaged in the aforementioned unlawful conduct for purposes of unlawfully competing against MDC and negatively impacting MDC's business.

150.    The Defendant's aforementioned conduct was tortious and also in furtherance of the multiple breaches of Hafer's and Misisco's Employment Contracts.

21

151.    Absent the issuance of immediate and permanent injunctive relief, the Defendants will continue engaging in their unlawful conduct, thereby causing additional damages to MDC.

152.    MDC is entitled to immediate and permanent injunctive relief prohibiting the Defendants from continuing to engage in the aforementioned unlawful conduct.

COUNT V
Violation of Federal Trade Secrets Act
18 U.S.C. §1836
(Against all Defendants)

153.    MDC incorporates by reference herein the preceding paragraphs as if fully set forth.

154.    The Defendants acted collectively and concertedly, and without authorization or privilege, in misappropriating the information contained in the Client Database and the MDC Financial Models.

155.    This information is confidential and constitutes trade secrets under the law.

156.    This information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

157.    The Defendants acted collectively and concertedly, and without authorization or privilege, in misappropriating MDC's confidential trade secret information in violation of 18 U.S.C. §1836.

158.    The Defendants acted collectively and concertedly in willfully and maliciously misappropriating MDC's confidential trade secret information in violation of 18 U.S.C. §1836.

159.    As a direct and proximate result of the Defendants' misappropriation of MDC's confidential trade secret information, MDC has incurred damages in excess of $500,000.

22

COUNT VI
Violation of Pennsylvania Trade Secrets Act
12 Pa.C.S. §§5302, *et seq.*
(Against all Defendants)

160.    MDC incorporates by reference herein the preceding paragraphs as if fully set forth.

161.    The Defendants acted collectively and concertedly, and without authorization or privilege, in misappropriating the information contained in the Client Database and the MDC Financial Models.

162.    This information is confidential and constitutes trade secrets under the law.

163.    The Defendants knew or had reason to know that they acquired these trades secret by improper means.

164.    The Defendants, at the time they disclosed or used these trade secrets, knew or had reason to know that they had been acquired by improper means.

165.    The Defendants, at the time they disclosed or used these trade secrets, knew or had reason to know that they had been acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

166.    The Defendants, at the time they disclosed or used these trade secrets, knew or had reason to know that they were derived from or through a person who owed a duty to MDC to maintain their secrecy or limit their use.

167.    The Defendants acted collectively and concertedly, and without authorization or privilege, in misappropriating MDC's confidential trade secret information in violation of 12 Pa. C.S. §5302, *et seq.*

23

168.   The Defendants acted collectively and concertedly in willfully and maliciously misappropriating MDC's confidential trade secret information in violation of 12 Pa. C.S. §5302, *et seq.*

169.   The Defendants' acts in misappropriating these trade secrets were intentional and in gross neglect of their duties.

170.   The Defendants' acts in misappropriating these trade secret evince a reckless indifference of the rights of MDC, and an entire want of care so as to raise the presumption that the Defendants were conscious of the consequences of their carelessness.

171.   As a direct and proximate result of the Defendants' misappropriation of MDC's confidential trade secret information, MDC has incurred damages in excess of $500,000.

WHEREFORE, Plaintiff respectfully requests the following relief:

A.   Compensatory damages in excess of $500,000, including, but not limited to:

(i)   Monetary damages for the actual loss caused by the breaches of the employment agreement, the aiding and abetting of illegal activities, the tortious interference with MDC's actual and prospective contractual relations and , and the misappropriation of MDC's confidential information and trade secrets;

(ii)   Monetary damages for unjust enrichment caused by the misappropriation of MDC's confidential information and trade secrets; and

(iii)   The recoupment of all fees or other remuneration received by SRR or any of the Former MDC Employees from any current and prospective client of MDC or clients obtained from MDC's referral sources, from April 20, 2016 through the expiration of the one-year period of injunctive relief requested below;

B.   Exemplary damages equal to two times the amount of the compensatory damages awarded;

24

C.      Attorney's fees as permitted by contract and/or statute;

D.      Injunctive relief in the form of:

         (i)      An immediate and permanent injunction prohibiting the Former MDC Employees from working for SRR or any other competitor of MDC for a period of one year;

         (ii)      An immediate and permanent injunction prohibiting the Defendants from soliciting any referral sources or current or prospective clients of MDC for a period of one year; and

         (iii).      An immediate and permanent injunction prohibiting the Defendants from soliciting any employees of MDC for a period of one year;

E.      Punitive damages; and

F.      Such other relief as this Court deems just and appropriate.

**Jacobs Law Group, PC**

Dated: October 10, 2016

Richard E. Miller (I.D. No. 46451)
Samuel M. First (I.D. No. 66176)
2005 Market Street
Suite 1120
Philadelphia, PA  19107
215-569-9701
Attorneys for Plaintiff

25